IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EAST YARD, LLC                              *

     Plaintiff,                          *

v.                                          *        CIVIL NO.: ADC-16-1143

HERITAGE-CRYSTAL CLEAN, LLC, et al.         *

     Defendants.                         *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

### Introduction

Defendants have filed a motion for summary judgment (ECF 48), Plaintiff has filed a response (ECF50). Defendants filed a reply (ECF 54). Plaintiff likewise filed a motion for summary judgment (ECF 49). Defendants filed a response (ECF 51). Plaintiff filed a reply (ECF 55). All filings are timely and the motions are ripe for review. No hearing is necessary pursuant to Local Rule 105.6.

### The Facts

Plaintiff, East Yard, LLC ("East Yard") owns commercial property known commonly as 1935 Chesapeake Avenue, Baltimore, Maryland. Defendants, who are related businesses (collectively "FCC"), are in the business of recycling and refining oil. On June 4, 2012, the parties entered into a lease (Letter of Intent and Reservation) whereby FCC would lease the property from East Yard and would obtain certain rights such as the right to extend the lease in order to allow FCC time to obtain permits and licensing required to conduct their oil refinery business.

1

On September 30, 2014, the parties entered into a First Amendment to Letter of Intent and Reservation ("Amendment") which is the subject of this litigation. The Amendment changed the extended reservation period to include 6 months from October 1, 2014 until April 1, 2015. During that time and in consideration for the extended reservation period, FCC paid East Yard $150,000 in 6 equal installments of $25,000. There is no dispute among the parties that the amount was paid. At the end of the reservation period, April 1, 2015, FCC notified East Yard that FCC would not purchase the property. East Yard alleges that FCC owes East Yard the additional fee of $150,000. FCC argues that the 6 payments of $25,000 each represent the $150,000 fee and it has been paid in full, or in the alternative, that the liquidated damages is a penalty and unenforceable.

**Standard of Review**

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Supreme Court has clarified that not every factual dispute will defeat a motion for summary judgment but rather, there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir.

2012). On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

The party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324.

In evaluating a motion for summary judgment, the Court must "view the facts in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255; *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion"). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th. Cir. 2003) (quoting Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## Analysis

A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418–19 (4th Cir.2004). The parties agree that Maryland law applies. In determining

3

the meaning of contractual language, Maryland courts have long adhered to the principle of the objective interpretation of contracts. *Wells v. Chevy Chase Bank, F.S.B.* 363 Md. 232, 250 (2001). Under the objective interpretation principle, where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court. *Id.* "If a written contract is susceptible of a clear, unambiguous and definite understanding ... its construction is for the court to determine." *Rothman v. Silver*, 245 Md. 292, 296 (1967).

However, "[t]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Wells* at 251. *See also Beckenheimer's Inc. v. Alameda Assocs. Ltd. Partnership*, 327 Md. 536, 547 (1992) ( "A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestations to mean").

The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed. *Kasten Constr. Co. v. Rod Enters., Inc.*, 268 Md. 318, 329, 301 A.2d 12, 18 (1973); *Liller v. Logsdon*, 261 Md. 367, 370, 275 A.2d 469, 470-71 (1971); *Belmont Clothes, Inc. v. Pleet*, 229 Md. 462, 467, 184 A.2d 731, 734 (1962); *ST Sys. Corp. v. Maryland Nat'l Bank*, 112 Md.App. 20, 34, 684 A.2d 32, 39 (1996). Whether a contract is ambiguous is a question of law. *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.* 129 Md. App. 455, 468 (1999). Contractual language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Id.* at 468.

In the present case, Plaintiff argues that the contract is unambiguous and the Court should enforce the contract based upon its clear meaning. Defendants argue that the additional $150,000

4

sought by Plaintiffs is (1) not what the parties intended (2) already paid by Defendants in the 6

payments of $25,000 each, and (3) an unenforceable penalty.

The language of the Amendment is clear and unambiguous. The Court applies the

standard of what a reasonable person would have meant at the time the Amendment (ECF 49-4)

was executed. *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). The

Amendment changed the focus of the original Letter of Intent (ECF 49-3) from a lease to the sale

of the property.

> "WHEREAS FCC now desires to purchase and East Yard now desires to sell the
> Premises and thus, the parties now desire to change the proposed transaction from a lease
> to a purchase and sale transaction and to amend and modify the LOI accordingly." (ECF
> 49-4).

In addressing the sale, the parties agreed to additional terms, including extending the

reservation period an additional six months until March 15, 2015. Also the parties agreed to an

increase in payments for those six months to be $25,000 per month, totaling $150,000. In return,

East Yard granted to FCC an exclusive option to purchase the property at a price of $2,750,000.

The real dispute centers on the liquidated damages clause:

> "In the event that FCC does not duly and timely exercise the Purchase Option, or
> otherwise close on the transactions contemplated by the Purchase and Sale Agreement by
> the Closing Date, FCC will be liable for and agrees to and shall pay to East Yard as
> liquidated damages the sum of One Hundred Fifty Thousand Dollars ($150,000) (the
> "Liquidated Damages") in immediately available funds; provided however that in no
> event shall FCC be obligated to pay the Liquidated Damages if FCC fails to exercise the
> Purchase Option or enter into or close the Purchase and Sale Agreement by the Closing
> Date due to (i) acts of God, war, quarantine..." (ECF 49-4).

Applying the plain meaning to the words, Defendants' arguments that (1) payment of the

liquidated damages was not what the parties intended and (2) that it was already paid, beg the

question – what purpose would adding the liquidated damages clause serve unless it was

additional consideration to protect East Yard in the event FCC failed to exercise the option to

purchase? There would be no need to add this language as liquidated damages. Defendants were already obligated to pay the 6 payments of $25,000 each. Had they failed to do so, the remedy for breach of contract was already available. Applying the clear language of the Amendment, the Court agrees that the language is unambiguous and should be given its clear meaning. *Kasten, supra.* There is no language in the liquidated damages clause that refers back to the 6 payments or anywhere in the contract that equates those 6 payments with the liquidated damages clause. Applying the reasonable person standard, the Court finds no ambiguity. *General Motors, supra.*

Assuming arguendo, Defendants could prove that some ambiguity exists, the Court must then look to the intent of the parties. The goal in construing a contract is to ascertain and effectuate the intention of the contracting parties, unless that intention is at odds with an established principle of law. *Philadelphia Indem. Ins. Co.* at 468, *citing Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290-91 (1996), *aff'd,* 346 Md. 122 (1997). "The primary source for determining the intention of the parties is the language of the contract itself." *Id.* Therefore, "[i]n construing insurance contracts in Maryland we give the words of the contract their ordinary and accepted meaning, looking to the intention of the parties from the instrument as a whole." *Finci v. American Cas. Co.,* 323 Md. 358, 369-70, (1991). Moreover, "[a] contract must be construed as a whole, and effect given to every clause and phrase, so as not to omit an important part of the agreement." *Baltimore Gas & Elec.,* 113 Md.App. at 554, 688 A.2d 496; *see Bausch & Lomb Inc., v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021 (1993).

As stated previously, looking at the contract as a whole, the intent of the parties is clear- the Defendants were obligated to pay the 6 payments of $25,000 *during the reservation period.* At the conclusion of the reservation period, Defendants had the option to purchase at the

purchase price or pay the additional liquidated damages. Defendants here gave notice to Plaintiff that they did not intend to purchase the property, therefore, they were obligated to pay the *additional* $150,000. There is no logical reason to construe the Amendment differently and no evidence to support Defendants' arguments otherwise. For example, there is no language that provides for the return of the 6 payments if Defendants elect to purchase the property. The 6 payments are clearly consideration that allowed Defendants exclusive rights during the reservation period and time to evaluate the purchase, which it appears Defendants at least initially intended. The fact that the $150,000 at issue is contained in the contract language as liquidated damages distinguishes it from the 6 payments and also by its own clear language, represents the negotiated priced for exercising the option to *not* purchase the property.

As Plaintiff points out in its motion, the following deposition excerpts support Plaintiff's argument that clearly the $150,000 liquidated damages was negotiated in addition to the 6 payments, totaling $300,000 anticipated by Defendants:

Vincent Glorioso, the Vice-President and General Manager of FCC2 and David Mitchell the Managing Member of East Yard, both testified at deposition regarding the process of negotiating the First Amendment. Mr. Glorioso, described a meeting that he and Inigo Sanz, his supervisor at HCC Corporation, had with Mr. Mitchell to convince him to extend the LOI:

A. We had a meeting with David Mitchell some time in August where Inigo Sanz flew up and talking about offers back and forth. Inigo was the one who proposed the 300,000, but there were also other stipulations with that. Essentially, Inigo's 300,000 dollars was FCC's willingness to commit up to that level of money, which would have included the 25,000 dollars per month.
Q. Okay, so that 300,000 would have been a combination of the monthly payments plus a termination fee at the end?
A. That is correct.
Q. If the option was not exercised?
A. That's correct.

David Mitchell testified at his deposition that this offer convinced him to extend the Reservation Period:
A. I remember going into the meeting with the mind that we were not going to come -- you know, we were not going to extend the contract beyond that one month. And that was my

thought going in. During the conversation, obviously they were trying to -- I don't remember the specific words they used, but they desperately wanted to extend the contract by six months.
Q. Were any terms of any proposed –
A. Yes.
Q. Hold on. Let me finish.
A. Okay.
Q. Were any terms of any proposed extensions discussed?
A. Yes."

Plaintiff's Memorandum at p. 8 (ECF 49-1).

Defendants' representative Mr. Glorioso clearly discussed the $300,000 cost, which included the 6 payments of $25,000 and the additional $150,000 liquidated damages needed to convince David Mitchell and East Yard to extend the reservation period. David Mitchell testified he went into the meeting with the intent to not extend the reservation period. Obviously Defendants were aware of East Yard's position ahead of time and offered the $300,000 package to make it more palatable to East Yard. No reasonable person could construe both the clear language of the Amendment and the intent of the parties otherwise.

The remaining argument as to the liquidated damages is whether it represents a penalty or was negotiated in good faith by the parties to reasonably represent the losses expected. A liquidated damages clause in a contract will be invalidated when it is grossly excessive and out of proportion to the damages that might reasonably be expected to result from a breach of the contract. *Barrie Sch. v. Patch*, 401 Md. 497, 509 (2007). Here, the Defendants agreed that the reservation period of six months was worth $150,000. Defendants also agreed that the property itself was worth $2,750,000. According to the deposition testimony, the amounts in the contract- 150,000 for the additional reservation period and the liquidated damages was offered by Defendants, who now claim it was excessive.

When considering the value of the property, $2,750,000 and the value Defendants offered in consideration of East Yard extending the reservation period, the Court finds as a matter of law

8

that the liquidated damages is not "grossly excessive and out of proportion" to the damages East Yard could face in light of a breach of contract. East Yard now either has to sell the property to another purchaser arguably at considerable costs or have the property vacant for a period of time. Since the $150,000 liquidated damages represents a small percentage of the value of the property and the rental value as well, it can hardly be said that it is grossly excessive. *Barrie Sch., supra.*

The remaining argument that Defendants do not raise in their motion for summary judgment but was raised in Plaintiff's motion and responded to by Defendants is the issue of joint and several liability for all of the Defendants. The general rule of corporate liability is that the successor corporations are not liable for the debts and obligations of their predecessor corporations. *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 290 (1989). There are, however, four exceptions to this general rule. The debts and liabilities of the predecessor corporation are imposed on the successor corporation when (1) there is an expressed or implied assumption of liability; *(2) the transaction amounts to a consolidation or merger;* (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts. *Id.*

In the present case, there is no express assumption of liability and no evidence is presented by way of any documents or testimony. There is however, at least arguably evidence of an implied assumption of liability. HCC Corporation paid the last four of the six $25,000 of the extended reservation payments. There is insufficient evidence presented to determine the nature of the transfer of FCC to HCC Corporation and then to HCC in order to determine whether the transaction amounted to a consolidation or merger. From the nature of the transactions between HCC and HCC Corporation regarding FCC's obligations under the Amendment, it appears that HCC Corporation and then HCC is a mere continuation of FCC.

There is no evidence presented that the transaction was entered into fraudulently to avoid FCC's debts. In fact it is the opposite – HCC Corporation continued the payments on behalf of FCC. The record therefore does not support exceptions (2) or (4), but there is evidence in support of the exceptions (1) and (3).

Plaintiff has argued that FCC is an instrumentality of HCC and HCC Corporation. Defendants argue that for an entity to be a mere instrumentality, the following factors are considered: (1) the presence in both corporations of the same officers or directors; (2) common shareholders; (3) financial support of the subsidiary's operations by the parent; (4) underwriting the incorporation and purchase of all of the capital stock of the subsidiary by the parent corporation; (5) the fact that the subsidiary was organized with a grossly inadequate capital structure; (6) a joint accounting and payroll system; (7) the subsidiary lacks substantial business contacts with any save the parent and operates solely with assets conveyed by the parent corporation; (8) in the financial statements of the parent, the subsidiary is referred to as a division of the parent corporation or obligations are assumed to be those of the parent; (9) the property of the subsidiary is used by the parent corporation as its own; (10) the individuals who exercise operating control over the subsidiary exercise it in the interest of the parent; and (11) failure to observe the formal requirements attributable to the operation of a subsidiary. *Dixon v. Process Corp.*, 38 Md. App. 644, 653-54, (1978) (quoting Annot., 7 A.L.R.3d 1343, 1355 (1966)).

The Court has reviewed the motions, responses and replies carefully as to this issue. I find that the arguments presented by Plaintiff both in Plaintiff's motion and reply is persuasive that the Defendants are in fact jointly and severally liable. As to the two exceptions (1) and (3) pursuant to *Baltimore Luggage Corp.*, HCC Corporation assumed the last four of six payments

of the reservation period after being purchased by HCC (ECF 49-1). David Chameli, general counsel for HCC declined the purchase option on behalf of FCC (ECF 49-7). Mr. Chameli testified as the 30(b)(6) representative for all three entities. It appears from the uncontradicted evidence that HCC and HCC Corporation impliedly assumed FCC's obligations and acted on behalf of FCC with respect to the Amendment.

Furthermore, in examining the 11 factors from *Dixon* set forth above, the Court is further persuaded that FCC was simply an instrumentality of HCC and HCC Corporation. Vincent Glorioso worked for FCC and HCC Corporation and was paid by HCC Corporation. After HCC purchased FCC, Greg Ray a Vice President of HCC became the Lubricants Manager for FCC.

There is evidence of the presence in both corporations of the same officers or directors (Glorioso, Ray, Chameli); financial support of the subsidiary's operations (payment of the last 4 installments of the reservation period); underwriting the incorporation and purchase of all of the capital stock of the subsidiary (purchase of stock and acknowledging no debt over 1,000,000); the subsidiary was organized with a grossly inadequate capital structure (questionable evidence of any independent FCC bank account); joint accounting and payroll system (HCC Corporation paying Glorioso's salary while at FCC); property of the subsidiary is used by parent corporation as its own (HCC assumed the Amendment as if it was with HCC as a party); the individuals who exercise operating control over the subsidiary exercise it in the interest of the parent (HCC exercised the option not to purchase the property , ECF 49-7).

The evidence supports the argument that FCC Corporation was an instrumentality of HCC Corporation and then HCC itself. Defendants have presented no persuasive evidence otherwise, and noticeably did not even raise the issue in their motion for summary judgment.

## Conclusion

In viewing the facts in the light most favorable to the non-moving party, there being no dispute as to any material fact, Plaintiff's motion for summary judgment is GRANTED. The evidence presented by Plaintiff is particularly persuasive since it is derived from Defendants' discovery responses and testimony. Defendant's Motion for Summary Judgment is DENIED. A separate Order will issue.

27 June 2017
Date

A. David Copperthite
United States Magistrate Judge